## STATE OF CONNECTICUT *v.* ERIC FLOYD
### (SC 15432)

Norcott, Katz, Palmer, Sullivan and Vertefeuille, Js.

(*Two justices dissenting in one opinion*)

3. The defendant's claim that the prosecutor improperly made a missing witness argument during closing arguments was unavailing; the prosecutor's remarks, when considered in the context of the entire trial, were not so pervasive or egregious as to violate the defendant's constitutional right to a fair trial.

This court having previously determined that the statute (§ 53-202k) applicable to the commission of a class A, B or C felony with a firearm is a sentence enhancement statute and not a separate crime, the defendant's conviction thereunder was ordered vacated.

Argued January 18—officially released July 25, 2000

*Neal Cone*, assistant public defender, for the appellant (defendant).

*C. Robert Satti, Jr.*, senior assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, J. The defendant, Eric Floyd, was convicted, after a jury trial, of murder in violation of General Statutes § 53a-54a (a),[1] commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k,[2] and criminal possession of a firearm in violation of General Statutes § 53a-217.[3] The defendant claims on appeal that: (1) the trial court improperly instructed the jury on the law of accessory liability; (2) the state violated his constitutional right to due process by failing to disclose impeachment evidence pertaining to the testimony of a state's witness; and (3) the state's attorney improperly made a missing witness argument during closing arguments. We direct the trial court to

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[3] General Statutes § 53a-217 provides in relevant part: "(a) A person is guilty of criminal possession of a firearm . . . when he possesses a firearm . . . and (1) has been convicted of a capital felony, a class A felony, except a conviction under section 53a-196a, a class B felony, except a conviction under section 53a-86, 53a-122 or 53a-196b, a class C felony, except a conviction under section 53a-87, 53a-152 or 53a-153, or a class D felony under sections 53a-60 to 53a-60c, inclusive, 53a-72a, 53a-72b, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216 . . . . For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction. . . ."

Although subsection (a) of § 53a-217 was amended in 1998, that amendment is not relevant to this appeal. For convenience, we refer to the current revision of § 53a-217 throughout this opinion.

vacate the defendant's conviction under § 53-202k,[4] but otherwise affirm the trial court's judgment.

The jury reasonably could have found the following facts: In the very early morning on January 21, 1994, Alex Delgado and the victim, Jose Avellanet, were walking on Clinton Avenue in Bridgeport when they were approached by the defendant, who held what appeared to be a nine millimeter gun. Delgado had known the defendant for several years. The defendant asked Delgado and the victim what they were doing there. Delgado responded that they "were just walking up the street." As the defendant accused Delgado and the victim of being there to rob him, Delgado was punched in the back of his head and knocked to the ground. Simultaneously, Delgado became aware of the presence of another person, whom he did not recognize and who was not identified during the defendant's trial. Delgado stood up and again told the defendant and the unidentified person that he and the victim were just walking on the street, and then asked the defendant and the unidentified person to let him and the victim leave. The defendant then fired his gun three or four times at the ground near Delgado's feet. Delgado then offered the defendant money and again asked the defendant to let him and the victim leave. The defendant took Delgado's money and jewelry, and the unidentified person took the victim's money.

---

[4] This court held in *State* v. *Dash*, 242 Conn. 143, 150, 698 A.2d 297 (1997), that § 53-202k is a sentence enhancement provision and not a separate crime, and that a criminal conviction under this provision is, therefore, improper. The defendant does not raise this issue on appeal. Nevertheless, "because of the serious constitutional ramifications, we examine this issue under the plain error doctrine." *State* v. *Harris*, 54 Conn. App. 18, 25, 734 A.2d 1027, cert. denied, 250 Conn. 925, 738 A.2d 660 (1999), citing Practice Book § 60-5. "Although the defendant's total effective sentence was proper, the judgment must be modified to reflect the fact that § 53-202k does not constitute a separate offense. Accordingly, the defendant is entitled to have his conviction under § 53-202k vacated." *State* v. *Harris*, supra, 25–26.

Shortly thereafter, the defendant called out the name "Mickey,"[5] and two men, who were farther up Clinton Avenue and whom Delgado could not identify, started running down the street toward Delgado and the others. At that point, Delgado turned and ran in the opposite direction. As he was running, he heard three or four gunshots flying and ricocheting around him. Delgado also heard the defendant shouting at him, demanding that he come back and stating that he knew where Delgado lived. Delgado ran around a corner and, at that point, could no longer see the defendant or the victim. Two other eyewitnesses, however, saw the defendant and Mickey fire multiple gunshots at the victim as he lay on the ground, after Delgado ran away.

Later that morning, John Corriss and Bruce Doherty, paramedics with the Bridgeport ambulance service, received an emergency call to proceed to Clinton Avenue between Railroad and State Streets. When they arrived at the location, they found the victim lying on the ground and observed that he had sustained multiple gunshot wounds. The paramedics then determined that the victim had ceased breathing and had no pulse. A subsequent autopsy revealed three gunshot wounds, one of which actually caused the victim's death and another of which potentially was fatal. The medical examiner recovered a nine millimeter bullet from the victim's body. The police recovered four spent nine millimeter cartridge casings, two spent .45 caliber casings and two .45 caliber bullets from the crime scene. Edward McPhillips, a criminalist with the Connecticut State Police Forensic Science Laboratory, specializing in the examination of firearms, testified that he believed that the bullets and casings were fired from at least four different weapons.

---

[5] The trial transcripts and other evidence in this case inconsistently refer to this person as "Mickey" and "Mikey." In the interests of consistency and clarity, we will refer to this person as Mickey throughout this opinion.

On April 11, 1994, the Bridgeport police arrested the defendant. The defendant subsequently was charged with the murder of the victim in violation of § 53a-54a (a), the attempted murder of Delgado in violation of General Statutes §§ 53a-49[6] and 53a-54a (a), commission of a class A, B or C felony with a firearm in violation of § 53-202k,[7] and criminal possession of a firearm in violation of § 53a-217. At the conclusion of the trial, the jury rendered a verdict of guilty of the crimes of murder, commission of a class A, B or C felony with a firearm, and criminal possession of a firearm, and not guilty of the crime of attempted murder. The trial court sentenced the defendant to a total effective term of imprisonment of fifty-five years.

The defendant appealed his conviction to this court pursuant to General Statutes § 51-199 (b) (3).[8] Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court improperly instructed the jury on the law of accessory liability under General Statutes § 53a-8.[9] Specifically, the defen-

---

[6] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

[7] See footnote 4 of this opinion.

[8] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[9] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable

dant contends, inter alia, that the trial court's instructions reasonably could be understood to permit the jury to treat the defendant as an accessory to murder even though the defendant, himself, allegedly did not act with the requisite intent to kill.[10] The defendant claims that the trial court violated his constitutional due process right to a fair trial by inadequately instructing the jury on the essential elements of the crime of accessory murder.

The defendant concedes that he did not raise this claim at trial, and thus seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. "The first two steps in the *Golding* analysis address the reviewability of the claim, and the last two steps involve the merits of the claim." *State* v. *Hafford*, 252 Conn. 274, 305, 746 A.2d 150 (2000). Because the record is adequate for our review of the defendant's claim, and because the claim implicates the defendant's due process right to a fair trial; see *State* v. *Anderson*, 212 Conn. 31, 36, 561 A.2d 897 (1989) ("the failure to instruct the jury

for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

[10] "To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." (Internal quotation marks omitted.) *State* v. *Diaz*, 237 Conn. 518, 543, 679 A.2d 902 (1996).

adequately on each essential element of the crime charged may [result] in a violation of the defendant's due process rights implicating the fairness of his [or her] trial" [internal quotation marks omitted]); we address the merits of the claim.

We begin our analysis with a review of the challenged portions of the trial court's instructions on accessory liability.[11] The defendant first challenges the following

[11] The trial court instructed the jury on accessory liability for murder as follows: "If you credit [the] testimony [that both the defendant and another person fired shots into the body of the victim], and if it leaves in your mind a reasonable doubt as to which individual actually fired the shot that actually caused the death of [the victim], that requires [this court to] instruct you on the law of principal and accessory. As to either the murder, or either of the two manslaughter charges, where there is an element that the defendant caused the death of [the victim], as to each of those three charges, that element is basically the same. It makes no difference whether [the victim's] death was actually inflicted by this defendant's firing [of] a gun, or by another person. If the defendant was engaging with that other person in a common purpose to carry out an activity, as [this court] will charge you, he would be guilty of either murder, or any of the lesser included offenses, depending on what you find proven as to the other elements of those crimes. If the injury is caused thereby, even though it was not the defendant's actual gunshot, but that of others that he was acting in concert with, that caused the death of [the victim], and if you found . . . all of the other elements of those crimes, whichever one it is, proven beyond a reasonable doubt, and you simply don't know which, whether it was Mickey and/or the defendant, but you were satisfied beyond a reasonable doubt it was one or the other, that would constitute proof.

"It is of no consequence that the evidence may not clearly establish that the death of [the victim] was caused by the defendant, or any accomplice, as [this court] will explain that term to you. We have another statute, § 53a-8 . . . called our accessory statute, which reads as follows: A person acting with the mental state required for the commission of an offense, who intentionally aids another person in conduct which constitutes an offense, shall be criminally liable for such conduct, and may be prosecuted and punished, as if he were the principal offender. If two or more persons participated in the crime, they are equally responsible, even though it was the immediate act of only one which actually brought about the crime's completion, in that case, here, the death. Participation means not only actively sharing in its final commission, but in doing anything to aid or assist the conduct which caused it.

"The defendant here is charged with committing, in the first count, one substantive crime of murder. The accessory statute, as [this court] ha[s]

language: "If the defendant was engaging with that other

just read to you, merely provides alternative means by which a substantive crime may be committed. The fact that the defendant is not charged as an accessory, and that the state is making no direct claim here, does not preclude him from being so convicted of murder by you as an accessory. It is not required that the state prove that it was actually [the defendant] who caused the death of the victim in this case, as long as you find that he was an accessory, as [this court] will explain that term to you. Whether a person who was present at the commission of a crime aids in its commission, so as to be criminally responsible for it, depends on the circumstances surrounding his presence there and his conduct while there.

"Since the guilt of one who aids is equal to the guilt of one who actually commits the crime, § [53a-8] renders anyone who comes within its terms guilty as a principal offender. Therefore, if you find that, based on the testimony you've heard here, from the various witnesses, that this defendant either actually caused the death, or was an accessory to . . . Mickey in causing the death, he would be as guilty as charged, murder, as long as you find the other elements have—obviously those crimes to have been established to your satisfaction, beyond a reasonable doubt. If a person aided another in conduct which constitutes an offense, he is, in the eyes of the law, just as guilty of the crime charged as though he directly committed it, or directly participated in its commission. Everyone is a party to a crime who actually commits it, or who does some act forming part of it, or who directly or indirectly does any act which is part of it.

"If there is a joint criminal enterprise, each party to it is criminally responsible for all the acts done in furtherance of it. So, therefore, if, as [this court] indicate[s], you find there is some question in your mind as to who actually fired a fatal shot in this case, but you are satisfied that working in a common purpose, both this defendant and Mickey had the intent to cause the death, or in the manslaughter charges, to cause serious physical injury, the fact that you cannot specifically [co]nclude which one fired the fatal shot would not prevent you from finding the defendant here guilty as a principal of any of the specific charges here. In order to be an accessory to a crime, the defendant must have the same intent required for the commission of murder, that is, an intent to kill, or, if you are now dealing with the intentional manslaughter charge, the intent to cause serious physical injury, as [this court has] explained that term to you.

"To be an accessory to a crime, a person must be more than simply present as a companion at the commission of the crime. One must do something more than passively acquiesce in it, or instantly do certain acts, which, in fact, did aid in the commission of the offense. Unless there was a criminality of intent and unlawful purpose in common with the actual perpetrator of the crime, one is no[t] an accomplice under the statute. But if the defendant is proven beyond a reasonable doubt to have aided any other person, here, Mickey, with the criminal and common intent to kill, or in the manslaughter charge, to inflict serious physical injury, he is just as

person in a common purpose to carry out an activity
much a participant in the crime as if he had, himself, committed it and caused the death. If any person committed the crime charged, that is, it was the gun of either that person or of another person, and they were acting in concert with each other, you could find the person guilty as charged on an accessorial theory.

"Plus, if you accept the testimony of [Michael] Younger and [Reginald Barry, two of the state's witnesses], and it alone, or along with other evidence that you credit, convinces you beyond a reasonable doubt that this defendant either actually caused the death of [the victim], or that he was an accessory to Mickey in causing the death of [the victim], he would be guilty, at least of that particular element of causing the death would have been proven. This accessory charge that [this court has] just given you would apply both to the crime of murder and the lesser included offense[s] of intentional manslaughter and reckless manslaughter."

After receiving the trial court's instructions and deliberating for a short period of time, the jury requested that the court reinstruct it on certain matters, including accessory liability. The trial court then gave the following supplemental instruction concerning accessory liability: "The accessory statute is codified in § 53a-8 . . . and it reads, insofar as it applies to this case, as follows: A person acting with the mental state required for the commission of an offense, who intentionally aids another person in conduct which constitutes an offense, shall be criminally liable for such conduct, and may be prosecuted and punished as if he were the principal offender. That simply means although there—we're now going to describe the liability of an accessory to a crime—a person that you don't have to charge, the person as an accessory, if, in fact, under the law, he is an accessory, he may be charged as a principal and found guilty as a principal. If two or more persons participate in a crime, they are equally responsible, even though it was the immediate act of only one which actually brought the crime about. An example that is sometimes given would be two persons rob a bank. One person sits out front in a car, the so-called get away car, the other person goes in and robs the bank. They are both equally responsible for the crime because they participated in it. The one person, actually the one inside with the gun who takes the money out, jumps back in the car. The person in the car, as long as he is aware of what the person inside is going to do, and was well aware of it, and cooperated, he's as guilty of the crime of robbery, or whatever, bank robbery, whatever it would be. That's just to get a common example of what we mean by principal and accessory. Participation means not only actively sharing in its final commission, but in doing anything to aid or assist the conduct which causes it. The defendant here is charged with committing, in the first count, one substantive crime: murder. The accessory statute that [this court has] just read to you merely provides an alternative means by which a substantive crime may be committed.

"The fact that the defendant is not charged as an accessory, and the state is making no such claim, does not preclude him from being so convicted

... he would be guilty of either murder, or any of the

of murder, or any of the lesser included offenses as an accessory. It is not required that the state prove that it was actually [the defendant] who caused the death of [the victim], as long as you find that he was an accessory, and [this court] will shortly explain that term to you. Whether a person who was present at the commission of a crime aids in its commission so as to be criminally responsible for it, depends on the circumstances surrounding his presence there [and] his conduct while there.

"Since the guilt of one who aids is equal to the guilt of one who actually commits the crime, § 53a-8 renders anyone who comes within its terms guilty as a principal offender. Therefore, if you find, based on testimony in this case that you find credible, that this defendant actually caused the death of [the victim], or was an accessory to someone else, because you are unable to assign exact responsibility for who fired a fatal shot at [the victim], the defendant could be convicted of the crime charged, or of either of the lesser included offenses, as an accessory. If a person aided another in conduct which constitutes an offense, he is, in the eyes of the law, just as guilty of the crime charged as though he had directly committed it or directly participated in its commission.

"Everyone is a party to a crime who actually commits it, or does some act forming part of it, or who directly or indirectly does any act which is a part of it. If there is a joint criminal enterprise, each party to it is criminally responsible for all acts done in furtherance of it. The other person is an accessory to the commission of a crime, if acting with the mental state required, that is, the mental state required for either murder, the intentional manslaughter or the recklessness, he does or intentionally aids another person in the commission of the crime. So, in order to be an accessory to a crime, the defendant must have the same intent required for the commission of whatever crime you find to have been proven here, as [this court] ha[s] explained those terms to you just a few moments ago. And he must have had an intent to aid the other party in this case, someone by the name of Mickey, in the actual commission of the crime. To be an accessory to a crime, a person must be more than simply present as a companion at the commission of the crime. One must do something more than passively acquiesce in it or innocently do certain acts, which, in fact, did aid in the commission of the offense.

"Unless there was criminality of intent and unlawful purpose in common with the actual perpetrator of the crime, one is not an accomplice under the statute. But if the defendant here is proven beyond a reasonable doubt to have aided another person, here . . . Mickey, if the criminal and common intent required for any of the crimes charged in the first count, or the lesser included offenses contained with them, the first two of which, murder and intentional manslaughter, would include an intent to do something, whereas, in the reckless manslaughter, the element there is recklessness as opposed to intent, he is as much a participant in the crime as if he had, himself, committed it.

lesser included offenses, depending on what you find proven as to the other elements of those crimes. If the injury is caused thereby, even though it was not the defendant's actual gunshot, but that of others that he was acting in concert with . . . [i]t is of no consequence that the evidence may not clearly establish that the death of [the victim] was caused by the defendant, or any accomplice . . . . Everyone is a party to a crime who actually commits it, or who does some act forming part of it, or who directly or indirectly does any act which is part of it. If there is a joint criminal enterprise, each party to it is criminally responsible for all the acts done in furtherance of it. . . . If any person committed the crime charged, that is, it was the gun of either that person or of another person, and they were acting in concert with each other, you could find the person guilty as charged on an accessorial theory."

After deliberating for a short period of time, the jury requested further instructions on the elements of murder and first degree manslaughter, and the definitions of intent, accessory and reasonable doubt. The court provided the jury with supplemental instructions, a portion of which the defendant challenges. The relevant portion of those instructions provides: "An example

"If any person committed the crime charged here, either murder, or either of the two lesser included offenses of manslaughter, as [this court] ha[s] indicated, that is, it was the gun of either the defendant or of Mickey that actually took the life of the victim here, the defendant was an accessory to that person, as [this court has] explained. If he is an accessory to that person, [this court has] explained he would be legally just as guilty of the crime as if you had found that he had, in fact, fired the fatal shot. Thus, if you believe and credit the testimony of . . . [state witnesses] Barry and Younger, or a combination thereof, and it alone, or along with other evidence that you credit, convinces you beyond a reasonable doubt that the defendant actually caused the death of [the victim], or that he was an accessory to Mickey, as [this court] ha[s] defined that term, in actually causing the death of [the victim], he would be guilty of either of the crime of murder, or either of the lesser included offenses, depending on what your finding is as to a balance of the elements of those specific crimes charged."

that is sometimes given would be two persons rob a bank. One person sits out front in a car, the so-called get away car, the other person goes in and robs the bank. They are both equally responsible for the crime because they participated in it. . . . The person in the car, as long as he is aware of what the person inside is going to do, and was well aware of it, and cooperated, he's as guilty of the crime of robbery, or whatever, bank robbery, whatever it would be. That's just to get a common example of what we mean by principal and accessory. Participation means not only actively sharing in its final commission, but in doing anything to aid or assist the conduct which causes it. . . . Everyone is a party to a crime who actually commits it, or does some act forming part of it, or who directly or indirectly does any act which is part of it. If there is a joint criminal enterprise, each party to it is criminally responsible for all acts done in furtherance of it."

The defendant, relying on *State* v. *Diaz*, 237 Conn. 518, 679 A.2d 902 (1996), claims that the foregoing instructions were improper because, "when viewed in isolation, that language reasonably may be understood to permit the jury to treat the defendant as an accessory, and therefore be subject to liability as a principal, even though he himself did not act with the requisite intent to kill." Id., 536.

The defendant also claims that the trial court's instruction that "[i]t is of no consequence that the evidence may not clearly establish that the death of [the victim] was caused by the defendant, or any accomplice," could have misled the jury to believe that it could find the defendant guilty of murder even if the state proved neither that the defendant had killed the victim nor that an accomplice had done so.

The defendant raises two additional challenges to the trial court's jury instructions for the first time in his

reply brief.[12] First, he challenges the court's instruction that "[i]f any person committed the crime charged here, either murder, or either of the two lesser included offenses of manslaughter . . . that is, it was the gun of either the defendant or of Mickey that actually took the life of the victim here, the defendant was an accessory to that person . . . ." The defendant claims that this instruction, when considered with the bank robbery hypothetical, could have misled the jury to believe that it must infer an intent to kill from the defendant's knowledge of and cooperation in the principal's conduct. Second, the defendant challenges the court's instructions that, "if . . . you are satisfied that . . . both this defendant and Mickey had the intent to cause the death, or in the manslaughter charges, to cause serious physical injury, the fact that you cannot specifically [co]nclude which one fired the fatal shot would not prevent you from finding the defendant here guilty as a principal," and that, "[i]n order to be an accessory to a crime, the defendant must have the same intent required for the commission of murder . . . ." The defendant claims that these instructions improperly prevented the jury from understanding that it could find that the defendant participated in the attack on the victim without finding that he shared the principal's intent to kill, and thus prevented the jury from understanding that it could find the defendant guilty of a lesser included offense of murder even though the principal could be found guilty of murder.

---

[12] "It is a well established principle that arguments cannot be raised for the first time in a reply brief. . . . Claims of error by an appellant must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument." (Citations omitted; internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 593–94 n.26, 657 A.2d 212 (1995). Nevertheless, because these claims implicate the defendant's right to due process, and because the record is sufficiently complete, we will consider the merits of these claims. Cf. *State* v. *McIver*, 201 Conn. 559, 563, 518 A.2d 1368 (1986).

Our standard of review for claims of instructional impropriety is well established. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . *State* v. *Cooper*, 227 Conn. 417, 444, 630 A.2d 1043 (1993). The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rule of law. . . . *State* v. *Figueroa*, 235 Conn. 145, 170, 665 A.2d 63 (1995). Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . *State* v. *Anderson*, [supra, 212 Conn. 37]. Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . *State* v. *Lemoine*, 233 Conn. 502, 509, 659 A.2d 1194 (1995)." (Internal quotation marks omitted.) *State* v. *Diaz*, supra, 237 Conn. 536–37.

We turn now to our analysis of the defendant's first claim of instructional impropriety. The defendant claims that the trial court's instructions, as previously set forth, and particularly its instructions based on the bank robbery hypothetical, in which it stated that as long as "[t]he person in the car, as long as he is aware of what the person inside is going to do, and was well aware of it, and cooperated, he's as guilty of the crime of robbery, or whatever, bank robbery, whatever it would be," as the principal, were improper because they did not require the jury to find that the defendant had the requisite intent to commit the crime of murder. Specifically, the defendant claims that the jury could have understood the instructions to permit it improperly to find accessory liability for murder under a stan-

dard derived from theories of common design,[13] felony murder,[14] or the *Pinkerton* doctrine,[15] none of which requires the state to prove an intent to kill.

We recognize that, when viewed in isolation, the portion of the instructions containing the bank robbery hypothetical possibly could be understood to allow the jury to find the defendant liable for *whatever* crime the principal had committed, even if it found that the defendant did not share the intent required for that crime. As in *Diaz*, however, we find that, "when viewed in the broader context of the trial court's instructions in their entirety"; id., 541; the instructions were not misleading. In *Diaz*, we noted that the trial court's instructions on accessory liability, which required the jury, in order to find the defendant guilty of murder as an accessory, to determine "that the defendant had a criminality of intent and unlawful purpose in common with the person or persons who actually committed the crime"; (internal quotation marks omitted) id., 539–40;

[13] Under the common design theory, "[a]ll who join in a common design to commit an unlawful act, the natural and probable consequence of the execution of which involves the contingency of taking human life, are responsible for a homicide committed by one of them while acting in pursuance of, or in furtherance of, the common design." (Internal quotation marks omitted.) *State* v. *Cots*, 126 Conn. 48, 59, 9 A.2d 138 (1939).

[14] General Statutes § 53a-54c, Connecticut's felony murder statute, provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[15] Under the *Pinkerton* doctrine, "a conspirator may be held liable for criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." *State* v. *Diaz*, supra, 237 Conn. 526, citing *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

together with its instruction that murder requires an intent to cause the death of another person; id., 540; adequately explained to the jury that it could not find the defendant guilty of accessory murder unless he had an intent to kill. Id., 541. Similarly, in this case, we find that the court's bank robbery hypothetical "was simply a part of the court's summary of the principles underlying accessory liability. Furthermore, and most importantly, the trial court forcefully and repeatedly instructed the jury regarding the specific intent necessary to convict the defendant of murder . . . as an accessory." Id., 537.

The trial court in this case instructed the jury that "if . . . you are satisfied that . . . both this defendant and Mickey had the intent to cause the death, or in the manslaughter charges, to cause serious physical injury, the fact that you cannot specifically [co]nclude which one fired the fatal shot would not prevent you from finding the defendant here guilty as a principal . . . . In order to be an accessory to a crime, the defendant must have the same intent required for the commission of murder, that is, an intent to kill, or, if you are now dealing with the intentional manslaughter charge, the intent to cause serious physical injury . . . ." In its supplemental instructions, the court instructed the jury that, "in order to be an accessory to a crime, the defendant must have the same intent required for the commission of whatever crime you find to have been proven here," and that, "[u]nless there was a criminality of intent and unlawful purpose in common with the actual perpetrator of the crime, one is not an accomplice under the statute. . . . [I]f the criminal and common intent required for any of the crimes charged in the first count, or the lesser included offenses contained with them, the first two of which, murder and intentional manslaughter, would include an intent to do something, whereas, in the reckless manslaughter, the element

there is recklessness as opposed to intent, he is as much a participant in the crime as if he had, himself, committed it."

We conclude that, when viewed as a whole, the trial court's instructions on the law of accessory liability reasonably could not have led the jury to believe that it could find the defendant guilty of murder under an accessory theory without first finding that he had the requisite intent to kill.

We also reject the defendant's argument that the trial court's instruction that "[i]t is of no consequence that the evidence may not clearly establish that the death of [the victim] was caused by the defendant, or any accomplice," could have misled the jury to believe that it could find the defendant guilty of murder even if the state did not prove that either the defendant or an accomplice had killed the victim. In light of the entire charge, it is not reasonably possible that the jury understood the challenged instruction to mean that it could convict the defendant of murder even if it found that the victim was killed by neither the defendant nor an accomplice, as that term was explained by the court, but by some other person. In particular, in the instructions immediately preceding the challenged language, the trial court charged the jury that if it "simply [doesn't] know which [person caused the fatal injury], whether it was Mickey and/or the defendant, *but . . . w[as] satisfied beyond a reasonable doubt it was one or the other*, that would constitute proof." (Emphasis added.) The trial court subsequently charged the jury that, "if . . . you are satisfied that . . . both this defendant and Mickey had the intent to cause the death, or in the manslaughter charges, to cause serious physical injury, the fact that you cannot specifically [co]nclude which one fired the fatal shot would not prevent you from finding the defendant here guilty as a principal," that "[i]f any person committed the crime charged, that is,

it was the gun of either that person or of another person, and they were acting in concert with each other, [the jury] could find the person guilty as charged on an accessorial theory," and that, if the testimony "convinces [the jury] beyond a reasonable doubt that this defendant either actually caused the death of [the victim], or that he was an accessory to Mickey in causing the death of [the victim], he would be guilty, at least of that particular element of causing the death would have been proven." When the challenged portion of the court's instructions is taken in context, the most reasonable understanding of it is that the jury could convict the defendant of murder, even if it could not determine whether the fatal gunshot wound was inflicted by the defendant or by an accomplice, and that it must be convinced beyond a reasonable doubt that it was one or the other that inflicted the fatal gunshot wound. Therefore, the instruction, taken as a whole, was proper. See *State* v. *Delgado*, 247 Conn. 616, 627, 725 A.2d 306 (1999) (" 'persons acting with the mental state required for commission of murder, who intentionally aid one another to engage in . . . such conduct . . . are accessories' " even if it cannot be determined beyond reasonable doubt who fired fatal shot); *State* v. *Roseboro*, 221 Conn. 430, 437 n.6, 604 A.2d 1286 (1992) (recognizing that "[i]t is of no consequence that the evidence does not clearly establish which of the killings were committed by the defendant and which were done by his accomplice").

We also reject the defendant's argument, which he based on case law from other jurisdictions, that the following instructions, when considered with the bank robbery hypothetical, misled the jury by suggesting that it *must* infer an intent to kill from the defendant's knowledge of and participation in the accomplice's

criminal conduct.[16] The court instructed the jury that, "[i]f any person committed the crime charged here, either murder, or either of the two lesser included offenses of manslaughter . . . that is, it was the gun of either the defendant or of Mickey that actually took the life of the victim here, the defendant was an accessory to that person . . . ." We first note that the instruction is most reasonably understood as being united to the statement immediately following that one, in which the court stated that, "*[i]f* [the defendant] is an accessory to that person . . . he would be legally just as guilty of the crime as if you had found that he had, in fact, fired the fatal shot. Thus, if you . . . [are] convince[d] . . . beyond a reasonable doubt that the defendant . . . was an accessory to Mickey . . . he would be guilty of either the crime of murder, or either of the lesser included offenses, depending on what your finding is as to a balance of the elements of those specific crimes charged." (Emphasis added.) In other words, the court's instructions are most reasonably understood as instructing the jury that, *if* it found that the defendant was an accessory, that is, if, as explained elsewhere by the court, the defendant participated in the killing *and* shared the principal's intent to kill, then the defendant would be as guilty of murder as the principal.

Addressing the gist of the defendant's claim, we note that state of mind often is established by circumstantial evidence. See *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000) ("direct evidence of the accused's state of mind is rarely available [and] . . . intent is often inferred from conduct . . . and from the cumula-

---

[16] The defendant cites, among other cases, *People* v. *Kelly*, 423 Mich. 261, 289, 378 N.W.2d 365 (1985) (Levin, J., concurring in part and dissenting in part) ("[k]nowledge or participation is evidence that supports an inference of an intent to aid and abet, but neither knowledge nor participation, nor both, are sufficient").

.tive effect of the circumstantial evidence and the rational inferences drawn therefrom" [internal quotation marks omitted]). Accordingly, it would have been permissible for the jury to have inferred that the defendant intended to cause the victim's death based on evidence establishing that the defendant participated in the killing and was aware of the principal's intentions and conduct. Indeed, under the circumstances of this case, where two eyewitnesses saw the defendant fire multiple gunshots at the victim as he lay on the ground, it would have been remarkable for the jury not to have made such an inference. Nevertheless, we find nothing in the trial court's instructions that explicitly *required* the jury, as a matter of law, to infer that the defendant had an intent to kill from evidence of mere participation in and awareness of the principal's conduct. Indeed, the trial court instructed the jury that the defendant "must do something more than . . . do certain acts, which, in fact, did aid in the commission of the offense. Unless there was a criminality of intent . . . one is no[t] an accomplice . . . ." Therefore, we need not consider whether such an instruction would have been improper.

Finally, we reject the defendant's argument that the trial court's instructions improperly prevented the jury from understanding that it could find that the defendant had participated in the attack on the victim and also find that he did not share the principal's intent to kill, and that it thus could find him guilty of a lesser included offense of murder, even if it would have convicted the principal of murder. The court instructed the jury that if it was satisfied that "both this defendant and Mickey had the intent to cause the death, or in the manslaughter charges, to cause serious physical injury, the fact that you cannot specifically [co]nclude which one fired the fatal shot would not prevent you from finding the defendant here guilty as a principal . . . . In order to be an

accessory to a crime, the defendant must have the same intent required for the commission of murder, that is, an intent to kill, or, if you are dealing with the intentional manslaughter charge, the intent to cause serious physical injury . . . ." The defendant contends that this instruction misled the jury to believe that, if it found that the principal had the intent to kill, it must either find that the defendant had the same intent or acquit him.

The gist of the defendant's argument is that an accessory need not share the same criminal intent as the principal in order to be convicted as an accessory, but that he may have a different intent than the principal, and be convicted, as an accessory, of a different crime than the principal. It is not clear, however, that that is the law in Connecticut. We repeatedly have held that "[t]o be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime . . . . *State* v. *Haskins*, 188 Conn. 432, 465, 450 A.2d 828 (1982)." (Internal quotation marks omitted.) *State* v. *Diaz*, supra, 237 Conn. 543. This suggests that, to be guilty as an accessory, the defendant must have the same intent as the principal. We also have stated, however, that "accessorial liability . . . merely requires that a defendant have the mental state required for the commission of a crime while intentionally aiding another. *State* v. *Foster*, 202 Conn. 520, 529–31, 522 A.2d 277 (1987)." (Internal quotation marks omitted.) *State* v. *Nixon*, 231 Conn. 545, 554, 651 A.2d 1264 (1995); see also *State* v. *Malone*, 40 Conn. App. 470, 481, 671 A.2d 1321, cert. denied, 237 Conn. 904, 674 A.2d 1332 (1996) ("defendant must have had the intent to aid the principal and in so doing must have intended to commit the offense with which he is charged"). These formulations suggest that the defendant need only have the intent required for conviction of the offense with which he is charged, which may be different than the offense with which the principal is,

or could have been, charged, and which may have a different intent requirement.

We considered a similar claim in *State* v. *Crosswell*, 223 Conn. 243, 612 A.2d 1174 (1992). In *Crosswell*, the defendant argued that he could not be convicted as an accomplice under the accessory liability statute unless the state proved that he had the intent to commit the specific degree of the crime with which the principal was, or could have been, charged. See id., 257–58. We noted in *Crosswell* that our observation in *State* v. *McCalpine*, 190 Conn. 822, 832–33, 463 A.2d 545 (1983), that the accessory was not required to "possess the intent to commit the specific degree of the crime charged"; (internal quotation marks omitted) *State* v. *Crosswell*, supra, 258; was mere dictum. See id. We further noted that, in *State* v. *Foster*, supra, 202 Conn. 533–34, we had observed that Connecticut has taken the same approach to accessorial liability as the Model Penal Code. *State* v. *Crosswell*, supra, 260. We quoted Model Penal Code § 2.06 (7), which provides: "An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted *or has been convicted of a different offense or degree of offense* or has an immunity to prosecution or conviction or has been acquitted." (Emphasis added.) We concluded, however, that we did not need to resolve the defendant's claim because the evidence was sufficient to prove that the defendant had the same intent that was required of the principal. See *State* v. *Crosswell*, supra, 261–62. Accordingly, we did not expressly adopt the quoted portion of the Model Penal Code.[17]

---

[17] Nor does our holding in *State* v. *Parham*, 174 Conn. 500, 391 A.2d 148 (1978), squarely address the issue in this case. In *Parham*, the defendant challenged the trial court's instruction, claiming that it suggested that the jury could convict him of first degree burglary even if it found that he had no intention to engage in the aggravating conduct, as long as it found that he participated in the burglary. Id., 507. Because we concluded that the

The defendant urges us to follow New Jersey case law construing that state's accomplice liability statute. New Jersey courts have concluded that, "when a murder is committed by multiple perpetrators, and the case is submitted to the jury under a theory of accomplice liability, the jury should be informed that even if it concludes that the principal committed purposeful or knowing murder, the accomplice can be found guilty of a lesser offense [if he has a different level of intent]." *State* v. *Jackmon*, 305 N.J. Super. 274, 286, 702 A.2d 489 (1997); see *State* v. *Bielkiewicz*, 267 N.J. Super. 520, 528, 632 A.2d 277 (1993).[18]

We need not decide whether our accessorial liability statute allows an accused accomplice to have a different level of intent than the principal, however, because we conclude that, even if the interpretation urged by the defendant is correct, any error in the jury instructions was harmless beyond a reasonable doubt. The trial testimony of one eyewitness and the sworn statement of another eyewitness that was admitted into evidence indicated that, during the course of a chaotic and violent incident, the defendant and Mickey, acting in concert with each other, each fired multiple gunshots at the victim as he lay on the ground. There was no evidence from which the jury reasonably could have inferred that Mickey intended to kill the victim while the defendant merely intended to inflict serious bodily injury or recklessly engaged in conduct creating a grave risk of death. Therefore, even if we were to agree with the defendant that the jury reasonably could have understood the trial

evidence in that case supported a conviction of the defendant as either an accessory or a principal, we did not squarely address the claim of instructional impropriety. See id., 508–509.

[18] We note that the New Jersey statute construed in those cases does not require that the alleged accomplice act "with the mental state required for commission of an offense"; General Statutes § 53a-8; but, rather, requires the alleged accomplice to have "the purpose of promoting or facilitating the commission of the offense . . . ." N.J. Stat. Ann. 2C:2-6 c (1) (West 1995).

court's instruction to mean that, in order to find the defendant guilty as an accessory, it must find that the defendant had the same criminal intent as the alleged principal, and even if we were to agree that this instruction was improper, we would conclude that it was harmless beyond a reasonable doubt because the jury reasonably could not have found that the defendant had a level of intent different from that of the principal. When the instruction is considered in context, it is most reasonably understood as informing the jury that, if it could not conclude beyond a reasonable doubt that the defendant fired the fatal shot, but could conclude beyond a reasonable doubt that the defendant and Mickey had the requisite intent for either murder or some form of manslaughter, it could convict the defendant of the crime for which he had the requisite intent, assuming, of course, that the jury concluded beyond a reasonable doubt that the state had proven the other elements of the crime.

We conclude that it is not reasonably possible that the trial court's instructions on the law of accessory liability misled the jury. Accordingly, we conclude that the alleged constitutional violation did not clearly exist and did not clearly deprive the defendant of a fair trial. Therefore, the defendant has not satisfied the third prong of *Golding* and cannot prevail on his claim of instructional impropriety. See *State* v. *Golding*, supra, 213 Conn. 239–40.

II

The defendant also claims that, by failing to disclose certain impeachment evidence concerning its witness, Michael Younger, the state violated the defendant's constitutional right to due process. We disagree.

The following additional facts and procedural history are relevant to this claim. On June 28, 1994, the defendant filed a motion for discovery and inspection

requesting, inter alia, disclosure of exculpatory information or materials, the names and addresses of the state's trial witnesses, prior felony convictions of and pending felony and misdemeanor charges against any state witness, and "any inducement or reward offered to a witness or [codefendant] in return for [his] testimony . . . ." On August 23, 1994, the state responded that the names and addresses of witnesses and the charges against them would be disclosed at trial. At trial, the state called Younger as a witness. The state's attorney represented at oral argument before this court that, before Younger testified at trial, the state disclosed Younger's arrest record, which showed Younger's arrest history, the pending drug charges against him and his probation status at the time of his testimony.

Younger testified at trial that, on the night of January 20, 1994, he and the defendant, as well as several others, were selling drugs together on Clinton Avenue. Younger left the street at about 9:30 p.m. In the very early morning on January 21, 1994, Younger was sleeping at his home on Clinton Avenue when he heard someone outside yell, "stop that guy." Younger recognized the voice and identified it as that of a person named "Reggie." Younger went to his window and then heard Reggie say, "Fugi, stop that guy," and someone else say, "get down." He then saw the defendant and another person, whom Younger did not recognize, crossing the street toward Younger's house. Younger testified that he then heard a gunshot from under his window. He could not see who fired the shot because his view was obstructed by an overhanging roof. Thereafter, Younger saw a group of people, including Fugi and Mickey, running up the street toward the defendant. At the same time, the person who had been crossing the street with the defendant ran down Clinton Avenue in the opposite direction.

Younger also testified that he saw someone lying on the ground about thirty feet from his window, and that, after Mickey came up the street, he fired several gunshots at that person. Younger testified that he also saw the defendant fire gunshots at the person on the ground. After the shooting, Younger's wife called 911, and an ambulance arrived at the scene shortly thereafter. Younger testified that he did not see any police at the scene on the night of the shooting, and that he did not give any information to the police about the shooting at that time because he was afraid. The day after the shooting, he went to North Carolina for several days.

On cross-examination, Younger testified that he had been arrested in June, 1994, for possession of narcotics with intent to sell. During a police interview in connection with those charges, Younger told the police that he had information about the January 21, 1994 shooting. Subsequently, Younger gave a statement to the police about the shooting. The defendant was provided with a copy of that statement at trial, and defense counsel questioned Younger about the circumstances under which it was made.

Younger testified that, at the time of his arrest, he did not ask the police for any consideration in exchange for the information, and that he believed that "the police can't make deals for you in court." Younger also testified that he had four or five prior criminal convictions, including a conviction for first degree robbery, and that, at the time of his testimony, he was not being held in jail pending disposition of the drug charges. He further testified that he did not know whether the reason why the charges had not been disposed of was that the state was waiting to see what happened in the defendant's trial. Younger testified that, as of the time of his testimony, the state had not made him a plea offer.

Two other eyewitnesses to the killing, Reginald Barry and Delgado, also testified for the state. Barry claimed

not to have remembered seeing the defendant on the night of the killing, and, when shown his prior sworn statement to the police concerning the killing, claimed that he could not remember making it because he had been intoxicated when he made the statement. The statement was admitted into evidence as a prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986) ("allowing the substantive use of prior inconsistent statements, signed by the declarant, who has personal knowledge of facts stated, when the declarant testifies at trial and is subject to cross-examination"). Our review of the record and transcripts shows that Barry's statement and Delgado's testimony were substantially consistent with each other and with Younger's testimony.[19]

[19] Specifically, we note the following testimony: Younger testified that he was asleep at his home at 60 Clinton Avenue when he was awakened by the sound of "Reggie" yelling, "Fugi, stop that guy." Barry indicated in his statement, which was admitted at trial, that he was in a driveway at 65 Clinton Avenue when he saw "two guys with masks" approaching him. Barry did not identify the two men as Delgado and the victim, but, later in his statement, referred to the victim as "the schoolteacher." Believing that the men were going to rob him, Barry "yelled for Fugi."

Barry's statement indicated that, after he yelled for Fugi, the defendant "came out of [a] house with a big gun," approached Delgado and the victim as they walked down Clinton Avenue, and asked them what they were doing there. Delgado testified that, as he and the victim walked up Clinton Avenue, the defendant, who held a gun, approached them and asked what they were doing there.

Younger testified that, after being awakened, he heard someone say "get down." Barry's statement indicated that the defendant told Delgado and the victim to "get on the ground."

Delgado testified that, while he was on the ground, the defendant yelled for Mickey and, at that point, two men farther up the street started coming toward the defendant and Delgado. Younger testified that he saw Fugi, Mickey, and several others approaching the defendant just before the shooting. Barry indicated in his statement that he saw Mickey and several others get out of a car and approach the defendant, Delgado, and the victim just before shooting him.

Delgado testified that, after the defendant had taken his money and jewelry, he ran down Clinton Avenue toward Railroad Avenue. Younger testified that he saw one of the men attacked by the defendant run down Clinton

During closing arguments, defense counsel argued that Younger's expectation that he would receive favor-

Avenue toward Railroad Avenue. Barry's statement indicated that, after the defendant began to pistol whip the two men, one of the men ran.

Delgado testified that the defendant fired three or four gunshots at him as he ran. Younger testified that he heard a gunshot as the man ran, but could not see who fired it. Barry's statement indicated that the defendant fired a gunshot at the man who ran.

Younger testified that, after one of the men ran away, he saw the defendant fire several gunshots at the victim as he lay on the ground. Barry's statement indicated that the defendant fired approximately five gunshots at the victim as he lay on the ground.

There are, as the dissent notes, some inconsistencies in the testimony of the three eyewitnesses. This is not surprising considering the violent and chaotic nature of the incident, and the late hour of the night when it occurred. As the dissent also notes, some of the evidence suggests that both Delgado and Barry may have been at the scene in order to engage in criminal activity unrelated to the murder. Thus, certain inconsistencies in their testimony may be attributable to their desire to exculpate themselves from those activities, rather than their desire to inculpate the defendant. Thus, the testimony of the eyewitnesses is substantially consistent as it pertains to the essential question of the defendant's guilt.

The dissent also points out that Barry testified at trial that he had not seen the defendant on the evening of the homicide, and that he could not recall making a statement to the police concerning the incident because he had been exhausted and intoxicated when he gave the statement. The dissent implies that Barry's alleged state of intoxication makes Barry's statement unreliable. Upon review of the trial transcripts, however, we are convinced that the credibility of Barry's recantation is, to say the least, questionable. Sergeant Joseph Sherbo, a detective with the Bridgeport police department, testified that he was present while Barry's statement was taken, and that he witnessed Barry's signature on the statement. Sherbo further testified that Barry was coherent at the time, and that he was not stumbling or slurring his speech.

We also note that Barry was, at trial, able to recall certain events of the night of the shooting and the circumstances of his arrest approximately two weeks later. Specifically, Barry testified that he recalled being on Clinton Avenue near the site of the shooting on January 21, 1994, and that he had heard approximately ten gunshots fired. He also testified that, on the night in question, he had been selling drugs across the street from Younger's house on Clinton Avenue, and that he had been using crack cocaine. Furthermore, he testified unequivocally that he had not seen the defendant on Clinton Avenue on the night of the killing, not that he could not remember having seen him. Later, however, on cross-examination, he contradicted that testimony and testified that he could not "recall seeing anyone" that night.

able treatment from the state with respect to his pending drug charges in exchange for his testimony in this case made his testimony unreliable.[20] In rebuttal, the state's attorney argued that there was no evidence of a deal between the state and Younger by which Younger would receive favorable treatment in connection with his pending drug charges in exchange for his testimony.[21] The trial court charged the jury that it could

Barry also recalled being arrested on drug charges by the Bridgeport police approximately two weeks after the shooting and talking to the police at his house at that time. He testified, however, that he could not recall being "processed" at the police station later that same day or giving his statement to the police because he had been "highly intoxicated for twelve days" prior to his arrest. He also testified that "there was no way [he] could properly speak" on the day of his arrest because of his intoxication, and that he did not give a statement to the police. He then testified, however, that it was possible that he gave a statement, but just did not remember it. Still, later, on cross-examination, he testified that he could not understand how the police could claim that he gave a statement when he could not remember seeing anything on the night of the killing.

Barry also denied that the reason he was recanting his statement was that he was incarcerated and would be subject to reprisals in prison if he testified for the state in a murder case, or that he believed that the police had reneged on a deal that would have afforded him leniency on the drug charge against him in exchange for his statement.

The selective nature of Barry's lack of memory concerning the killing and his subsequent arrest and statement to the police and the inconsistencies in his testimony convince us that his claims of lack of memory and inability to make a statement due to exhaustion and intoxication were not credible.

[20] The transcript of defense counsel's closing argument provides in relevant part: "It seems that [all of the state's witnesses] get to talk to the police when they get arrested themselves, and they all are getting arrested for serious crimes. One of them has charges pending for a year and [one-half and] has an extensive record. I believe he testified he had five or six prior convictions, and of those prior five or six convictions, none of his cases lasted more than a year. Now, all of a sudden, he's not expecting any kind of special treatment here, but if he does what the state wants, his case is still pending out there, and we don't know what's going to happen to that case. Does he have an interest in this case? Does he have an interest in telling the story that the state would like him to tell with regard to this incident?"

[21] The transcript of the state's attorney's rebuttal argument provides in relevant part: "I believe that what [defense counsel is] saying is that you shouldn't believe the witnesses because they got these great deals from the state, I guess. Well . . . where is the evidence of it . . . ? Mr. Younger's

consider whether Younger was expecting favorable consideration in exchange for his testimony in deciding whether Younger had any bias, interest or motive to testify falsely.

After the defendant was convicted, the defendant's appellate counsel obtained information concerning the disposition of the drug charges against Younger, which, the defendant claims, showed that Younger had, in fact, received favorable treatment from the state in the criminal proceedings against him as of the date of his testimony in this case.[22] Specifically, appellate counsel learned that the state had not prosecuted Younger for a violation of his probation in connection with his June 21, 1994 arrest, and that the state had not opposed the reduction of Younger's $50,000 bond to a promise to appear. Appellate counsel also obtained evidence that, according to the defendant, shows that Younger received favorable treatment from the state after his testimony in this case. Specifically, appellate counsel

got a case pending. Mr. Younger testified. . . . I don't have any deal. Call his lawyer up. Have the lawyer come down and testify. There is no evidence at all to refute that, no evidence at all to refute that."

[22] Specifically, the defendant points to the following items of information. First, a 1997 state police bureau of identification arrest and conviction report concerning Younger showed that, as of the date of his June, 1994 arrest on drug charges, Younger was serving a five year term of probation in connection with an August 10, 1988 second degree robbery conviction, which probation term commenced on March 6, 1991. Second, the transcript of the July 11, 1994 proceeding in Younger's case showed that the state was aware of the defendant's probation status. Third, the transcript of the August 9, 1994 proceeding in Younger's case showed that the court granted Younger's request for a reduction of a $50,000 bond to a written promise to appear with no opposition from the state. Fourth, the transcript of the March 14, 1995 proceeding in Younger's case indicated that the state's attorney who was handling Younger's case, Joseph Marcello, "was to contact [his superior, Donald A. Browne, the state's attorney for the judicial district of Fairfield] in this matter to see if there is an offer in the file. It's continued many times at the request of [state's attorney] Browne." Fifth, on November 17, 1995, an assistant state's attorney, Joseph Corradino, requested another continuance of Younger's case to January 5, 1996, explaining to the court that he did not " think it's going to provide business, Your Honor, for the jury docket once our investigation is complete."

learned that, at the February 2, 1996 sentencing hearing in Younger's drug case, which occurred approximately two months after Younger's trial testimony in this case, the state indicated that it was filing a substitute information charging Younger with only one count of possession with intent to sell narcotics. Younger pleaded guilty to that charge, and the state recommended a five year prison sentence, execution suspended, and three years probation with special conditions. The trial court imposed the recommended sentence.

After filing an appeal in this case pursuant to § 51-199 (b) (3), the defendant filed in this court a motion for rectification or augmentation of the trial court record pursuant to what are now Practice Book §§ 66-5,[23] 61-10[24] and 60-2 (1) and (9).[25] In his motion, the defendant

[23] When the defendant filed his motion, what was then Practice Book § 4051 provided in relevant part: "A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable. . . .

"The appellate clerk shall forward the motion for rectification or articulation and the opposition, if any, to the trial judge who decided, or presided over, the subject matter of the motion for rectification or articulation for a decision on the motion. If any party requests it and it is deemed necessary by the trial court, the trial court shall hold a hearing at which arguments may be heard, evidence taken or a stipulation of counsel received and approved. The trial court may make such corrections or additions as are necessary for the proper presentation of the issues raised or for the proper presentation of questions reserved. The trial judge shall file the decision on the motion with the appellate clerk. . . ."

Because of an amendment to Practice Book § 66-5, effective January 1, 2000, the current version of § 66-5 differs from the version of former Practice Book § 4051, which was applicable when the defendant filed his motion.

[24] Practice Book § 61-10 provides: "It is the responsibility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire trial court record is complete, correct and otherwise perfected for presentation on appeal. For purposes of this section, the term 'record' is not limited to its meaning pursuant to Section 63-4 (a) (2), but includes all trial court decisions, documents and exhibits necessary and appropriate for appellate review of any claimed impropriety."

[25] Practice Book § 60-2 provides in relevant part: "The court may, on its own motion or upon motion of any party . . . (1) order a judge to take any action necessary to complete the trial court record for the proper

requested "an evidentiary hearing . . . to determine whether a plea [agreement] between the state and . . . Younger . . . [had been] disclosed to the trial court and to defense counsel [before Younger had testified], or whether its true nature was disguised or not disclosed . . . and whether Younger received other consideration from the state before the defendant's trial in return for Younger's anticipated testimony, and if so, whether such consideration was disclosed . . . and whether, as planned, Younger received other consideration from the state after the defendant's trial in return for Younger's testimony." The defendant's motion was forwarded to the trial court for a ruling pursuant to what is now Practice Book § 66-5. See footnote 23 of this opinion. The trial court denied the defendant's motion.

The defendant then filed a consolidated motion, requesting this court to exercise its supervisory powers pursuant to what is now Practice Book § 60-2, and for review of the trial court's denial of the defendant's motion for rectification or augmentation of the record, pursuant to what is now Practice Book § 66-7.[26] This court granted the defendant's motion for review and ordered the trial court to hold an evidentiary hearing to determine whether Younger and the state had a plea agreement when Younger testified at trial.

On August 17 and 31, 1998, the trial court conducted an evidentiary hearing in compliance with this court's order. Among the documents produced by the state at the hearing was the state's attorney's Part B file of the

presentation of the appeal . . . [and] (9) remand any pending matter to the trial court for the resolution of factual issues where necessary . . . ."

[26] Practice Book § 66-7 provides in relevant part: "Any party aggrieved by the action of the trial judge as regards rectification of the appeal or articulation under Section 66-5 may, within ten days of the issuance of notice of the order sought to be reviewed, make a written motion for review to the court, to be filed with the appellate clerk, and the court may, upon such a motion, direct any action it deems proper. . . ."

pending drug charges against Younger. Joseph Marcello, the supervisory assistant state's attorney in Part B of the Superior Court in the judicial district of Fairfield, identified the handwriting in the file as his own, and testified as to the contents of the file. The file contained numerous notations by Marcello documenting instructions from his superior, Donald A. Browne, then the state's attorney for the judicial district of Fairfield, concerning Younger's case. These notations included the following: (1) June 24, 1994, "Sergeant Sherbo—[Younger] gave good info on 2 murders [and] will notify [state's attorney] Browne per his instructions"; (2) June 27, 1994, "[s]tate will do nothing without detailed written letter"; (3) August 8, 1994, "[state's attorney] Browne says—release on PTA [promise to appear] (the case that [Younger] is going to testify on is still pending). DO NOT dispose until consulting Part A"; (4) November 23, 1994, "[s]poke with [state's attorney] Browne on this case. Continue until the end of January [and] [d]o not dispose without seeing me (Joe M[arcello]). I have to consult with [state's attorney] Browne before disposing"; (5) March 15, 1995, "[s]poke with [state's attorney] Browne—[h]e instructed us NOT to dispose of this file until the Part A case is over. ([Younger] is to testify in Part A case). He said to continue 2 more months"; and (6) January 23, 1996, "[s]poke with [state's attorney] Browne. [Younger] was an 'outstanding' witness in a murder case [and] testified for [C. Robert] Satti [Jr., the state's attorney representing the state at trial, and] helped obtain a conviction. Because of [Younger's] cooperation . . . 5 yrs E/S; 3 yrs Prob [five years imprisonment, execution suspended, three years probation and] terminate present probation. S.C. drug E & T [special condition, drug evaluation and treatment]."

At the hearing, the state also produced a letter, dated September 28, 1994, from Younger's attorney, Catherine E. Teitell, and addressed to Browne, which stated in

relevant part: "[An assistant state's attorney from Part B] suggested a long continuance in this case for the purpose of speaking with you regarding a disposition in light of . . . Younger's cooperation in the investigation of one of your cases in Part A. . . . [Younger] presents himself as a mature, respectful, educated, well-spoken man of thirty three and will make an excellent witness for you if called upon in the future to testify." The defendant's appellate counsel indicated at the hearing that he had never seen the letter before. The assistant state's attorney represented that the letter had been given to him on the morning of the hearing and that the letter had "ended up in [Younger's Part B] file eventually."

The following relevant testimony was elicited at the hearing: Teitell testified that she believed that she had discussed with Younger her letter to Browne, and that she and Younger "always spoke in terms of eventually achieving a plea agreement." Teitell testified that she never received any response to the letter. She also testified that she told Younger that his cooperation as a witness in this case could lead to favorable consideration in his drug case. She testified that there was no specific plea agreement with the state, but that there was "obviously a hope" for such an agreement. She acknowledged that no prosecutor ever had said to her that the state would be lenient with Younger in exchange for his testimony; rather, she had a "good faith basis" for her hope for favorable treatment because the state repeatedly had agreed to continuances in Younger's case, and had not objected to the reduction of Younger's $50,000 bond to a promise to appear. Teitell also testified that she believed that Browne's recommendation "went a long way in connection with [Younger's] probation status problem." Finally, Teitell testified that, while Younger's drug charges were pending, "he was doing well at work, he was doing well

on probation . . . [and] he was . . . doing well in his family life."

At the hearing, Browne testified that he had no specific recollection of the facts of Younger's case. He also testified that, generally, he would want to make certain that the charges against a defendant who also was a witness in another case were not disposed of prior to the witness' testimony because "as long as that case [against the witness] was pending, his incentive to be a truthful witness would be greater"; the witness would have such an incentive because his truthful testimony could be brought to the attention of his sentencing judge, "and judges often give that some consideration in imposing a sentence." Browne also testified that he assumed that the reason for the state's recommendation[27] for the reduction of bond to a promise to appear in Younger's case was Younger's willingness to testify. Browne further testified that it was his common practice to instruct state's attorneys in the judicial district of Fairfield to avoid making a specific plea agreement in situations in which a defendant is cooperating as a witness in another case because, among other reasons, "once you get into specifics, then you'd run into the risk [that] somebody later on is in disagreement on what the specifics are," and because "there were too many unknowns." Browne testified that he would, however, indicate to the testifying defendant's attorney that the defendant's cooperation would be brought to the attention of the sentencing judge. When asked if one reason for the policy against entering into plea agreements was that the existence of such an agreement would detract from the credibility of a witness, he could

---

[27] The transcript of the August 9, 1994 proceeding in Younger's case shows simply that the court reduced the $50,000 bond to a promise to appear upon Younger's request, which the state did not oppose, not that the state recommended the reduction. Accordingly, we assume that Browne uses the term "recommendation" in the sense of not opposing the reduction, not in the sense of affirmatively requesting it.

not "say that it wasn't something that may have occurred to [him] in certain cases."

Satti also testified at the hearing. Satti testified that he determined that there was no plea agreement between Younger and the state by asking Younger if there was such an agreement. He did not ask any of the state's attorneys involved in Younger's case whether such a plea agreement existed. Satti also testified that he first saw Teitell's letter to Browne about six months before the hearing, and that he made no attempt to disclose it to counsel for the defendant at that time.

Based on the foregoing evidence, the trial court concluded that there was no implied plea agreement between the state and Younger.

The defendant claims on appeal that the state violated his right to due process by failing to disclose the following: (1) that there was an implied agreement between the state and Younger that he would receive favorable treatment in exchange for his testimony; (2) that, assuming there was no implied agreement, there was an informal understanding that Younger would receive favorable treatment; and (3) that, assuming there was no implied plea agreement between the state and Younger, there was undisclosed impeachment evidence relating to Younger's testimony.

The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. "The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. *Brady* v. *Maryland*, 373 U.S. 83, 86, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State* v. *Simms*, 201 Conn. 395, 405 & n.8, 518 A.2d 35 (1986). In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence

was favorable to the defense; and (3) that the evidence was material." (Internal quotation marks omitted.) *State v. Correa*, 241 Conn. 322, 360–61, 696 A.2d 944 (1997).

"It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused. . . . *State v. McPhail*, 213 Conn. 161, 167, 567 A.2d 812 (1989); see also *State v. White*, 229 Conn. 125, 135, 640 A.2d 572 (1994)." (Internal quotation marks omitted.) *State v. McIntyre*, 242 Conn. 318, 323, 699 A.2d 911 (1997); see also *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). A plea agreement between the state and a key witness is impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*. *State v. McIntyre*, supra, 323.

We first consider whether there was an undisclosed, implied plea agreement between Younger and the state. The existence of an undisclosed plea agreement is an issue of fact for the determination of the trial court. See *State v. Satchwell*, 244 Conn. 547, 562, 710 A.2d 1348 (1998) (defendant is required to seek determination by trial court of fact-based claim of undisclosed agreement). Furthermore, the burden is on the defendant to prove the existence of undisclosed exculpatory evidence. See *State v. Simms*, supra, 201 Conn. 407 (noting that defendant had failed to prove existence of undisclosed exculpatory evidence).

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court. Beyond that, we will not go. *Pandolphe's Auto Parts, Inc.* v.

*Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980). *State* v. *Zindros*, 189 Conn. 228, 238, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). . . . *State* v. *Eady*, 249 Conn. 431, 436, 733 A.2d 112 (1999). A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *State* v. *Hodge*, 248 Conn. 207, 218–24, 726 A.2d 531 (1999). . . . *State* v. *King*, [249 Conn. 645, 660, 735 A.2d 267 (1999)]." *State* v. *Ross*, 251 Conn. 579, 592–93, 742 A.2d 312 (1999); cf. *Sandella* v. *Dick Corp.*, 53 Conn. App. 213, 219, 729 A.2d 813, cert. denied, 249 Conn. 926, 733 A.2d 849 (1999) ("A true implied contract can only exist where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words. . . . Whether and on what terms a contractual commitment has been undertaken are ultimately questions of fact which, like any other findings of fact, may be overturned only if the trial court's determinations are clearly erroneous." [Citation omitted; internal quotation marks omitted.]).

In support of his claim that there was an implied plea agreement, the defendant argues that the conduct of both the state and Younger showed that the state made an implied promise of leniency in exchange for Younger's testimony. In particular, the defendant argues that the evidence presented at the hearing showed that the state's lack of opposition to Younger's motion to reduce a $50,000 bond to a promise to appear, and the state's decision not to charge Younger with a violation of his probation for his June, 1994 arrest on drug charges, were consideration for Younger's past cooperation in this case, namely, his statement to the police, and an inducement for future cooperation, namely, his

testimony at trial. The defendant also argues that the state's sentencing recommendation for Younger in February, 1996, was consideration for Younger's testimony. The defendant contends that Younger originally faced a possible maximum sentence of thirty years imprisonment on a variety of drug charges, but, instead, was allowed to plead guilty to one count of possession with intent to sell, and received a lenient sentence of five years imprisonment, execution suspended, and three years probation with special conditions, which was to run concurrently with his term of probation that he was then serving.

We conclude that the trial court reasonably could have found, based on the evidence presented, that there was no implied plea agreement between Younger and the state. The trial court found that the evidence, including information contained in Younger's Part B file and Teitell's letter to Browne, established a connection between Younger's willingness to testify and the state's willingness not to oppose a reduction of his bond to a promise to appear and to continue the proceedings until after Younger's testimony in this case. That connection is not, however, sufficient to compel a finding that there was an implied plea agreement, especially when other evidence presented at the hearing militated against such a finding. Teitell testified that she had no knowledge of any specific plea agreement, but, rather, that she hoped that Younger's testimony would lead to such an agreement. Browne testified that he had no specific recollection of Younger's case. He also testified, however, that, although it was his practice to indicate to the attorney for a cooperating witness that the cooperation would be brought to the attention of the sentencing court, he generally does not enter into specific plea agreements in such cases. He testified that one reason for this policy is that "there are too many unknowns" for the state to commit itself to a plea agreement on

the sole basis that the defendant has agreed to testify in another case.

The trial court also found that Younger ultimately received a relatively lenient sentence, partly because of his cooperation in this case. That finding also is not sufficient to compel a conclusion that there was a plea agreement at the time of Younger's testimony. None of the evidence indicates that Younger had received any commitment from the state that his testimony would lead to a lenient sentence. At most, he had a hope for leniency.

Considering all of the evidence, a reasonable fact finder would not be compelled to conclude that there was an implied plea agreement between Younger and the state. Accordingly, we conclude that the trial court's factual finding that there was no such implied agreement must stand.[28]

The defendant next claims that, even if there was no implied plea agreement between Younger and the state, there was an undisclosed, informal understanding that Younger would benefit from testifying as a state's witness against the defendant. This claim is conceptually inseparable from the defendant's claim that the state failed to disclose impeachment related evidence. Under the circumstances of this case, if any alleged undisclosed evidence constituted impeachment evidence, it is only because the evidence suggested that there was such an informal understanding. Accordingly, we will consider these claims together.

The defendant claims that the state improperly failed to disclose its lack of opposition to the reduction of

[28] We also note that, to the extent that there was an unexpressed intention of the state that Younger's cooperation would be brought to the attention of the sentencing judge, such unexpressed intentions do not fall within the ambit of *Brady*. See *State* v. *Rucker*, 177 Conn. 370, 376, 418 A.2d 55 (1979) (unexpressed intention of state not to prosecute witness not within ambit of *Brady*).

Younger's $50,000 bond to a promise to appear and its decision not to prosecute Younger for a violation of his probation based on his June, 1994 arrest, both of which indicated that Younger had received a benefit from the state in exchange for his testimony. The defendant also contends that the existence of an informal agreement that Younger would receive a benefit from testifying may be inferred from both the contents of Teitell's letter to Browne and from the information contained in Younger's Part B file, neither of which was disclosed prior to trial. The defendant contends that all of this evidence constituted impeachment evidence because it showed that Younger had a motivation to give testimony favorable to the state.

The state conceded at oral argument that it never disclosed to the defendant that it had not opposed Younger's request for a reduction of a $50,000 bond to a promise to appear. Nor did it disclose Teitell's letter. The state's attorney who represented the state at trial explained at oral argument that he had not been aware of the state's lack of opposition to the bond reduction at the time of the defendant's trial, and that the letter from Teitell was not in his files until after the defendant was convicted. He concedes, however, that this would not excuse nondisclosure of the information. See *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988) (where police department possessed exculpatory material, prosecutor had constructive possession thereof, for purposes of *Brady*, inasmuch as "[t]he [s]tate's duty of disclosure is imposed not only upon its prosecutor, but also on the [s]tate as a whole" [internal quotation marks omitted]). The state's attorney also represented at oral argument that, if he had been aware of this information at the time of trial, he would have disclosed it. The state concedes, and we agree, that the evidence was favorable to the defendant.

The state argues, however, that evidence of its lack of opposition to the reduction in bond and the decision not to prosecute Younger for a violation of his probation, was not "suppressed," as that term is used in *Brady* v. *Maryland*, supra, 373 U.S. 83, because it was a matter of public record. The state further argues that, even if some evidence, i.e., the letter from Teitell,[29] was suppressed, the evidence was not material because its disclosure would not have altered the outcome of the trial, and the suppression, therefore, was not a violation of *Brady*. See *State* v. *McIntyre*, supra, 242 Conn. 324. We conclude that evidence was suppressed, but that it was not material.

The state claims that evidence of the lack of opposition to the reduction of Younger's bond and his probation status was a matter of public record at the time of trial because such evidence was reflected in Younger's public criminal file. Relying on *State* v. *Simms*, supra, 201 Conn. 407–408, the state argues that information that is a matter of public record and that can be discovered by the defendant through reasonable diligence is not suppressed, as that term is used in *Brady*.

In *Simms*, the defendant claimed that the state had an obligation to disclose psychiatric records of a witness when the only indication that such records existed was a reference to them in a previously published opinion of this court. Id., 406–407. The state in that case represented at oral argument that it had no such records in its files. We found that the defendant had not proved the existence of the records, and held that, because a published opinion of this court was "a matter of public record which the defendant could have pursued without the assistance of the state . . . the state cannot be said to have 'suppressed' [the] evidence . . . ." Id., 407–408.

---

[29] The state never directly addresses whether the information in Younger's Part B file was suppressed under *Brady*. It is clear from the record, however, that the file was not disclosed until the date of the evidentiary hearing.

In this case, unlike in *Simms*, the state did have in its files information—the letter from Teitell[30] and Younger's Part B file—that would have enabled the defendant to establish a link between the bond reduction and the fact that Younger was not prosecuted for a violation of his probation, on the one hand, and Younger's willingness to testify, on the other hand. The defendant could not have obtained the evidence without the assistance of the state.[31] The defendant, in his motion for discovery and inspection, specifically had requested information concerning state witnesses. The state's attorney responded by disclosing part of Younger's criminal record. The United States Supreme Court has recognized that "an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist." *United States* v. *Bagley*, supra, 473 U.S. 682. The state, having effectively represented to the defendant at the time of trial that the undisclosed information did not exist, cannot now claim that it was a matter of public record and that the defendant should have performed a diligent search for it. Accordingly, we conclude that the evidence was suppressed under *Brady*.

[30] The state's attorney claimed that the letter was not in the Younger file. Nevertheless, there is no dispute that Browne received the letter, and, as we noted previously in this opinion, the state is charged with possession of it.

[31] We are not persuaded by the state's argument that this case is governed by *State* v. *Reddick*, 33 Conn. App. 311, 324–36, 635 A.2d 848 (1993), cert. denied, 228 Conn. 924, 638 A.2d 38 (1994) (transcript of witness' testimony in prior trial not "in possession" of prosecuting authority). We recognize that, before the evidentiary hearing and without the assistance of the office of the state's attorney, the defendant's appellate counsel learned of the bond reduction and Younger's probation status by examining the transcripts of the proceedings in Younger's case. As we discussed elsewhere in this opinion, however, both the letter from Teitell and Younger's Part B file were sources of impeachment evidence and were possessed by the state's attorney in Younger's case. We conclude that, under *Demers* v. *State*, supra, 209 Conn. 153, the state's attorney in this case had both access to and control over those documents, and, therefore, was "in possession" of them for *Brady* purposes.

We now consider whether the suppressed information was material in a constitutional sense under *Brady*. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *United States* v. *Bagley*, [supra, 473 U.S. 682]; *State* v. *Shannon*, [212 Conn. 387, 399, 563 A.2d 646, cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512 (1989)]; *State* v. *Pollitt*, 205 Conn. 132, 148–49, 531 A.2d 125 (1987)." (Internal quotation marks omitted.) *State* v. *Correa*, supra, 241 Conn. 361. "[W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady. State* v. *Gant*, 231 Conn. 43, 53, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995)." *State* v. *McIntyre*, supra, 242 Conn. 324.

The purpose of requiring the state to disclose impeachment evidence to a criminal defendant is "to ensure that the jury knows the facts that might motivate a witness in giving testimony . . . ." (Internal quotation marks omitted.) *State* v. *Paradise*, 213 Conn. 388, 400, 567 A.2d 1221 (1990). In determining whether impeachment evidence is material, "the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony [was] further impeached by disclosure of the [alleged] deal." (Internal quotation marks omitted.) Id., 401. The fact that the witness' testimony is corroborated by additional evidence supporting a guilty verdict also may be considered in determining whether the suppressed impeachment evidence was material. See *Quintana* v. *Commissioner of Correction*, 55 Conn. App. 426, 439, 739 A.2d 701, cert. denied, 252 Conn. 904, 743 A.2d 614

(1999) ("[c]ourts have found that improperly withheld impeachment evidence is not material where the testimony of the witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict").

When Younger testified, defense counsel had information that Younger had a lengthy arrest record, that drug charges against him had been pending for approximately eighteen months, that he was not being held in prison and that, at the time of his arrest on the drug charges and at the time of his testimony, he was on probation for a 1988 robbery conviction. During cross-examination, Younger testified that he did not know whether his case had not been disposed of because the state was waiting for his testimony in this case. He also testified that, at the time of his arrest, he did not ask the police about making a deal in exchange for information about this case. He further testified that, although he had numerous prior convictions and pending drug charges against him, he was not being held in jail. He testified that, nevertheless, to his knowledge, the state had given him no consideration in exchange for his agreement to testify in this case. There is nothing in the record to suggest that Younger's testimony was false or intentionally misleading.

The jury reasonably could have inferred from Younger's testimony that, even though he did not have a specific deal with the state and did not know of any past consideration for his testimony, his pending charges provided a motivation for him to testify favorably for the state. Indeed, in closing arguments, defense counsel urged the jury to make that very inference. See footnote 20 of this opinion. Furthermore, the trial court instructed the jury that it could consider whether Younger was expecting favorable treatment from the state in the case pending against him in deciding

whether Younger had any bias, interest or motive to testify falsely.

We recognize that the suppressed evidence was not merely cumulative because it could have allowed the defendant to establish a stronger link between Younger's willingness to testify for the state and his expectation of favorable treatment from the state. The test for the materiality of impeachment evidence, however, is whether further impeachment of the testimony might have resulted in a different verdict. *State* v. *Paradise*, supra, 213 Conn. 401. Because the jury was apprised of Younger's motivation for testifying falsely for the state, the impeachment value of the suppressed evidence merely would have been incremental. Furthermore, Younger's testimony was corroborated by the other two eyewitnesses, lending additional credibility to his testimony.[32] See *Quintana* v. *Commissioner of Correction*, supra, 55 Conn. App. 439.[33]

We conclude that there is no reasonable probability that the jury would have reached a different verdict had the state disclosed the suppressed evidence. Therefore, the evidence was not material under *Brady*.[34] Accordingly, the defendant's *Brady* claim must fail.

---

[32] See footnote 19 of this opinion.

[33] We also note that Younger gave his written statement concerning the killing to the police before he received any favorable treatment from the state. That statement was available to the defendant at trial, and the defendant questioned Younger about the circumstances under which the statement was made. Even if the suppressed evidence had been disclosed, the existence of Younger's written statement and his testimony concerning the circumstances under which it was made constitute additional evidence from which the jury reasonably could have inferred that favorable treatment by the state was not the primary reason why Younger provided the state with information implicating the defendant in the crime.

[34] The dissent, relying on *United States* v. *Smith*, 77 F.3d 511 (D.C. Cir. 1996), and *United States* v. *Cuffie*, 80 F.3d 514 (D.C. Cir. 1996), would hold that the nondisclosure in this case was material. Those cases are distinguishable from this case, however. In *Smith*, the witness had, and presumably knew that he had, an express plea agreement with the government. *United States* v. *Smith*, supra, 513. On cross-examination, the witness did not reveal, intentionally or otherwise, the full extent of the plea

agreement. Id., 513–14, 516. The court concluded that if the defendant in that case had known of the full extent of the plea agreement, he could have "pursued devastating cross-examination . . . suggesting that the witness might have deliberately concealed the other favors from the Government." Id., 516. Therefore, the court held that the nondisclosure was material. Id.

In this case, unlike in *Smith*, there was no undisclosed plea agreement and there is no indication in the record that Younger was aware that he had received favorable treatment from the state as a result of his testimony, or that he did not reveal his knowledge of any such treatment. Moreover, we are not persuaded by the court's reasoning in *Smith*. If the full extent of the plea agreement in that case had been disclosed, the government presumably would have questioned the witness about it during its direct examination in order to preempt any "devastating cross-examination." Id. Likewise, in this case, had the state disclosed the impeachment evidence to the defendant, the state presumably would have questioned Younger about it during direct examination, thereby diminishing its impeachment value on cross-examination.

In *United States* v. *Cuffie*, supra, 80 F.3d 514, the government witness testified at trial that he had entered into a plea agreement with the government and that he had engaged in conduct that violated his oath as a police officer. Id., 516. The government, however, had failed to disclose that the witness had committed perjury in a prior proceeding. Id., 515. The court noted that "impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial *by the same kind of evidence*." (Emphasis added.) Id., 518. The court held that the undisclosed evidence was material because it was of a different kind than the evidence with which the witness had been impeached. Id. Moreover, the witness' testimony in *Cuffie* was the only evidence supporting an important factual finding. Id. In this case, the undisclosed evidence was of the same kind as the impeachment evidence that was introduced, namely, that the defendant's testimony was motivated by a hope for favorable treatment from the state in his pending drug case. Furthermore, while we recognize that Younger's testimony was not merely cumulative of other evidence admitted at trial, neither was it as important as the testimony at issue in *Cuffie*.

Finally, the dissent reads *Kyles* v. *Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), too broadly. Relying on *Kyles*, the dissent writes that "a reviewing court must focus on the fairness of the trial the defendant actually received rather than on whether a different result would have occurred had the undisclosed evidence been revealed." A careful reading of *Kyles*, however, shows that, under that case, the fairness of a trial is *measured* by the probability of a different result. Id., 434 (equating fair trial with "a trial resulting in a verdict worthy of confidence," and quoting *Bagley* to effect that reasonable probability of different result is shown when confidence in outcome is undermined by government's suppression of evidence). The court in *Kyles* did not suggest that, any time that the government's suppression of evidence implicates the fairness of the trial, understood as

This does not mean, however, that we condone the failure of the office of the state's attorney to disclose its lack of opposition to the reduction of Younger's bond to a promise to appear, its decision not to pursue the violation of probation against Younger and the letter from Teitell. The failure to disclose that information is inexcusable and, were it not for the fact that the evidence was not material under *Brady*, the judgment would have been reversed.

## III

The defendant's final claim is that, during closing arguments, the state's attorney improperly made a missing witness argument.[35] Specifically, the defendant complains of the following statements: "[W]here is the

some abstract notion unrelated to the probability of a different result, the suppression is material. Rather, the court simply emphasized that a defendant is not required to show that, after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough evidence left to convict. Id., 434–35. Nor does the defendant need to show by a preponderance of the evidence that he would have been acquitted if the exculpatory or impeachment evidence had been disclosed. Id., 434. The defendant, however, must show that, had the state disclosed the evidence, there is a reasonable probability of a different verdict. See id. Thus, *Kyles* did not change the *Bagley* materiality standard, i.e., that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *United States* v. *Bagley*, supra, 473 U.S. 682. We conclude in this case that confidence in its outcome has not been undermined, and, therefore, the defendant has not shown that a different result was reasonably probable.

[35] The defendant also claimed in his brief that the state's attorney improperly vouched for Younger's credibility during closing argument by stating: "I don't expect he'd get any consideration from the state. I don't have any deal." After the defendant's brief was filed, however, a corrected transcript was filed by stipulation of the parties. The corrected transcript showed that the state's attorney, who was paraphrasing Younger's testimony, actually stated: "I don't expect to get any consideration from the state." After the filing of the corrected transcript, the defendant did not make any further claim that this argument was improper. Accordingly, we do not review the claim.

evidence of [a plea agreement, defense counsel] . . . ? Call [Younger's] lawyer up. Have the lawyer come down and testify." The defendant claims that these remarks improperly suggested to the jury that the defendant would ordinarily call the witness' defense attorney as a witness, but that he was reluctant to do so in this case because he was afraid of what the attorney would have said. The defendant did not object to these remarks at trial.

"We have previously acknowledged that prosecutorial misconduct can occur in the course of closing argument. . . . It is well settled, however, that a defendant may not prevail under *Golding* or the plain error doctrine unless the prosecutorial impropriety was so pervasive or egregious as to constitute an infringement of the defendant's right to a fair trial, nor will we invoke our supervisory authority to reverse an otherwise lawful criminal conviction absent a showing that the conduct of the prosecutor was so offensive to the judicial process that a new trial is necessary to deter such misconduct in the future. . . . Finally, we must review the challenged comments in the context of the entire trial, with due regard to the extent to which the objectionable remarks were invited by defense conduct or argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Satchwell*, supra, 244 Conn. 564.

Although we do not condone the remarks of the state's attorney, and caution against the making of such remarks in the future, we conclude that, in the context of the entire trial, those remarks were not "so pervasive or egregious as to constitute an infringement on the defendant's [constitutional] right to a fair trial . . . ." Id. Therefore, the defendant cannot prevail on this claim.

The judgment is reversed only as to the separate conviction under § 53-202k[36] and the case is remanded

---

[36] See footnote 4 of this opinion.

with direction to vacate the defendant's conviction under § 53-202k and to resentence the defendant to a total effective sentence of fifty-five years. The judgment is affirmed in all other respects.

In this opinion PALMER and VERTEFEUILLE, Js., concurred.

KATZ, J., with whom NORCOTT, J., joined, dissenting. The majority concludes that the trial court properly found that there had been no implied plea agreement between the state and one of its witnesses, Michael Younger, despite: the state's lack of opposition to Younger's motion to reduce a $50,000 bond to a promise to appear; the state's decision not to charge Younger with a violation of probation for his June 21, 1994 arrest on drug charges; the state's willingness to continue the proceedings until after Younger had testified as a state's witness; the evidence from Younger's attorney reflecting her hope that he would be given favorable consideration in his drug case; and the lenient treatment he in fact ultimately received. Following its thorough discussion of the procedural history and governing legal principles, the majority thereafter determines, inter alia, that, having provided an incomplete response to a specific discovery request, the state cannot hide behind the "public record" curtain. Accordingly, the majority concludes that the state suppressed impeachment evidence.

I agree with the majority that the state improperly suppressed impeachment evidence.[1] Therefore, the only issue remaining on appeal is whether the suppressed

---

[1] For purposes of this discussion, I assume, without deciding, that the trial court properly determined that there had been no implied plea agreement between the state and Younger.

evidence was material.[2] The majority concludes that the evidence was not material. I disagree.

In *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), the Supreme Court held that favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." See *Kyles* v. *Whitley*, 514 U.S. 419, 433–34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

In *Kyles*, the court elaborated on the meaning of materiality under *Bagley*, stressing that a reviewing court must focus on the fairness of the trial the defendant actually received rather than on whether a different result would have occurred had the undisclosed evidence been revealed. Id., 434. As the *Kyles* court made clear, the test for materiality is not a sufficiency of the evidence test. Id., 434–35. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. "Indeed, a sufficiency-of-the-evidence test would require appellate courts to usurp the function of the jury, for judges would be forced to *guess*, based on a cold record, how the jury might have weighed the remaining evidence, standing alone, in a hypothetical error-free trial. Because such an inquiry is inherently unreliable, *Kyles* rightly focuses attention instead on

---

[2] It bears mention that although the state's good or bad faith in depriving the defendant of exculpatory evidence is irrelevant; *Rector* v. *Johnson*, 120 F.3d 551, 558 (5th Cir. 1997), cert. denied, 522 U.S. 1120, 118 S. Ct. 1061, 140 L. Ed. 2d 122 (1998); the state not only suppressed the impeachment evidence regarding Younger, but also attempted to capitalize on the defendant's ignorance in its closing argument by asking the jury to draw an adverse inference from the defendant's failure to call Younger's attorney as a witness to testify about what consideration Younger expected in exchange for his testimony.

the potential impact the undisclosed evidence might have had on the fairness of the proceedings." (Emphasis in original.) *United States* v. *Smith*, 77 F.3d 511, 515 (D.C. Cir. 1996).

"[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . . *Bagley*'s touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial." (Internal quotation marks omitted.) Id., 514.[3] Thus, the amount of additional evidence indicative of guilt is not dispositive of the inquiry. Instead, we must decide whether the undisclosed information could have affected substantially the efforts of defense counsel to impeach the witness, thereby calling into question the fairness of the ultimate verdict.

Purporting to apply this test, the majority relies on the impeachment evidence utilized by the defendant to conclude that any additional impeachment evidence would not have been material. I disagree. It is undisputed that the jury knew of Younger's criminal record,

---

[3] *Kyles* also made it clear that, "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Kyles* v. *Whitley*, supra, 514 U.S. 419; *United States* v. *Smith*, supra, 77 F.3d 514. "As the [*Kyles*] Court pointed out, no *Bagley* error can ever be harmless because a reasonable probability of a different result 'necessarily entails the conclusion that the suppression must have had a substantial and injurious effect or influence in determining the jury's verdict.' " *United States* v. *Smith*, supra, 514; see *United States* v. *Lloyd*, 71 F.3d 408, 411 (D.C. Cir. 1995) (adhering to same line of analysis).

that drug charges against him had been pending for nearly eighteen months, that he was not being held in prison awaiting trial, and that, at the time of his arrest on these drug charges, he was on probation for a prior robbery conviction. Finally, Younger testified that, to his knowledge, the state had given him no consideration in exchange for his agreement to testify for the state.

Although Younger was impeached at trial, "the fact that other impeachment evidence was available to defense counsel does not render additional impeachment evidence immaterial." (Internal quotation marks omitted.) Id., 515, quoting *United States* v. *O'Conner*, 64 F.3d 355, 359 (8th Cir. 1995) (per curiam). We look not merely to the ways that defense counsel was able to impeach the witness, "but to the ways in which the witness' testimony was allowed to stand unchallenged." *United States* v. *Smith*, supra, 77 F.3d 515. "Thus, undisclosed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence." *United States* v. *Cuffie*, 80 F.3d 514, 518 (D.C. Cir. 1996); see, e.g., *United States* v. *Maloney*, 71 F.3d 645, 653 (7th Cir. 1995), cert. denied, 519 U.S. 927, 117 S. Ct. 295, 136 L. Ed. 2d 214 (1996); *United States* v. *Quintanilla*, 25 F.3d 694, 699 (8th Cir.), cert. denied, 513 U.S. 978, 115 S. Ct. 457, 130 L. Ed. 2d 365 (1994); *United States* v. *Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994); *United States* v. *DeLuna*, 10 F.3d 1529, 1534 (10th Cir. 1993); *United States* v. *Marashi*, 913 F.2d 724, 732–33 (9th Cir. 1990).

In *United States* v. *Smith*, supra, 77 F.3d 515, the court recognized the significance of the ability to contest testimony, even in an area that had already been addressed. In that case, the defendant knew that the witness had entered into a plea agreement with the government under which ten of eleven counts against him in federal court had been dismissed, and that the

government had agreed to file a motion recommending a downward departure in sentencing. Nevertheless, the government did not disclose that it also had agreed to dismiss two felony charges pending against the witness. The court held that this additional evidence was not cumulative because the defense could have used it to impeach the witness' testimony, which went unchallenged, that he had disclosed the full extent of his plea agreement with the government. Id., 515–16.

In *United States* v. *Cuffie*, supra, 80 F.3d 515, the defendant challenged his conviction based upon the government's failure to disclose evidence involving a witness' prior perjury. The government had maintained that this undisclosed impeachment evidence was immaterial because the witness' testimony had not been essential to the prosecution's case against the defendant. Id., 518. Besides the witness' testimony, the government had presented circumstantial evidence that the defendant had possessed the drugs found in the bedroom of the witness' apartment: "namely that [the defendant] was in the apartment when the search warrant was executed; that he had a key to the locked bedroom containing the drugs on his person; that neither [the witness] nor [a codefendant] had a key to the locked bedroom on his person when he was arrested; and that there was other evidence of drug activity in the apartment." Id.

The court in *Cuffie* recognized that the remaining evidence, standing alone, would have been sufficient to convict. Nevertheless, it acknowledged that "materiality inquiry [of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] is not an assessment of the sufficiency of the evidence." *United States* v. *Cuffie*, supra, 80 F.3d 518. Accordingly, the court noted that the amount of additional evidence indicating guilt is not dispositive of the inquiry. Id. It sufficed that "[the witness'] testimony was an important part of the govern-

ment's case against [the defendant] because, as [the defendant's] counsel argued to the jury, it established the only direct connection between [the defendant] and the drugs found during the search of [the witness'] apartment." Id. In reversing the defendant's conviction, the court observed that, "[i]n light of the axiomatic importance of truthful testimony for the integrity of judicial proceedings, undisclosed evidence of a witness' prior perjury has a significant impact on the fairness of the trial." Id. For these reasons, the court was "unconvinced that the jury verdict [was] 'worthy of confidence' . . . ." Id. A cross-examination of the witness that revealed evidence casting serious doubt upon his truthfulness as a witness in a judicial proceeding could have changed the nature of the defendant's trial in *Cuffie*. Id., 519; cf. *United States* v. *Smith*, supra, 77 F.3d 516. Although the jury was presented with other reasons not to believe the witness' testimony, the state's failure to disclose the witness' prior perjury was significant.

In the present case, although the jury heard that Younger's case had been pending for eighteen months, it did not know that: although he had been held initially on a $50,000 bond, over the recommendation by the bail commissioner that bail be set at $10,000, the state agreed to have Younger released on a promise to appear; the state itself had orchestrated the numerous continuances in the defendant's case; the state's attorney had decided not to prosecute Younger for a violation of probation despite his arrest; when the state sought its last continuance date, January 5, 1996, which was the day after the defendant's trial, it indicated that it did not expect the case to "provide business" for the jury docket; and finally, Younger's attorney, Catherine E. Tcitell, had written a letter to the state on September 28, 1994, asserting her confidence in Younger's ability to cooperate. All of this evidence arguably constituted a reward for Younger's earlier cooperation with Sergeant

Joseph Sherbo, as well as an inducement for continued favorable treatment by the state, and lent credence to Teitell's "good faith basis" for her hope that Younger's cooperation with the state could favorably influence the disposition of his case. This evidence not only reflected the favors Younger had already received, but it also reasonably could have created in the minds of the jurors the distinct impression that Younger, an experienced criminal, expected a substantial benefit in exchange for testifying against the defendant.[4]

Despite Younger's testimony denying any quid pro quo, there was clearly identifiable evidence demonstrating a cognizable effort by the state to induce him to testify.[5] This evidence not only provided the incentive to testify, but it also called into question Younger's denial that he had been given any consideration by the state in exchange for his testimony. Armed with full disclosure, the defendant could have pursued damaging cross-examination of Younger challenging his denials

---

[4] The majority relies on the fact that Younger had given a statement concerning the killing to the police before receiving favorable treatment by the state as an indication that he had not been influenced principally by the state's beneficence. This reliance is misplaced. Because the statement was never introduced into evidence, was not marked for identification, and its subject matter was not otherwise disclosed to the jury through testimony, we cannot legitimately draw any conclusions about its contents. Additionally, because Younger gave the statement about the killing only after having been arrested, its existence does little to advance the majority's position.

[5] The majority states that "there is no indication in the record that Younger was aware that he had received favorable treatment from the state as a result of his testimony . . . ." I disagree. The various transcripts of Younger's court appearances provided to this court by the defendant demonstrate that the state's requests for continuances were made in open court, in the defendant's presence. Additionally, when seeking a bond reduction, in an attempt to remind the trial court of why Younger's $50,000 bond should be reduced to a promise to appear Teittel referred to "a substantial change in circumstances . . . [that had been] discussed . . . in chambers . . . ." At another of Younger's many court appearances, the state referred to discussions "in chambers" supporting its request for an additional continuance to January 5, 1995.

and suggesting that perhaps there were other "favors" provided in exchange for his testimony. Therefore, looking not just to the ways in which the defendant was able to impeach Younger, but also to the ways in which his testimony was allowed to stand unchallenged, I disagree with the majority's characterization of the impeachment value of the suppressed evidence as "merely incremental." I consider the potential impact of cross-examination by counsel armed with the aforementioned information sufficient to undermine confidence in the verdict.

In deciding that the evidence regarding Younger was immaterial, the majority also relies upon the testimony of two witnesses, Alex Delgado and Reginald Barry. Delgado testified that, on January 21, 1994, he and a friend, Jose Avellanet, were walking down Clinton Avenue in Bridgeport on their way to purchasing some marijuana when they were approached by the defendant, Eric Floyd, whom Delgado knew but had not seen in approximately six years. The defendant approached the two men, carrying a nine millimeter handgun. Delgado called for Avellanet to pull out his gun. When Avellanet failed to respond, the defendant, according to Delgado, accused the two men of being there to rob him. Suddenly, someone from behind punched Delgado on the back of the head, knocking him to the ground. Delgado did not recognize this other individual and could not determine whether he also had a weapon. As soon as Delgado got back up on his feet, the defendant began firing shots at the ground near Delgado's feet. He fired three or four shots in total. Delgado gave the defendant money and Avellanet also gave money and jewelry to the defendant and the other man who had punched Delgado. According to Delgado, approximately ten minutes later, the defendant called out the

name "Mickey"[6] and suddenly two men began running toward them. Before he could see their faces, Delgado turned and ran. The defendant, while yelling at him to return, fired three or four additional shots in his direction. Delgado testified that "[w]hen I ran, [Avellanet] ran." As he got a few blocks away, Delgado heard six to eight more shots being fired. Although Delgado and Avellanet were "real good friends," Delgado did not run to the police. Indeed, he did not even walk to the station. Rather, he gave a statement to the police some two and one-half months later, and then only after he had been brought in by the police. Finally, Delgado denied being in the area to seek revenge for a drug raid that had occurred at Avellanet's house one day earlier, despite the fact that Avellanet was carrying a pair of handcuffs and a semi-automatic Glock fully loaded with fifteen rounds.

Although their stories overlapped on some facts, Barry painted a somewhat different picture. Barry testified that in the very early morning of January 21, 1994, he had been selling narcotics from a site about two houses away from his own home when he heard several gunshots nearby. He was in his twelfth day of continuous crack cocaine use and was highly intoxicated. At that time, Barry had been using $100 to $200 of crack each day. He knew the defendant, and had seen him in the area once a week prior to the night in question. The defendant was always alone. At trial, Barry testified that he had not seen the defendant on the evening of the homicide.

Barry had been convicted of narcotics related offenses five or six times as a result of incidents that occurred prior to the night in question. Nearly three

---

[6] This individual is identified as both "Mickey" and "Mikey" in the transcripts. For purposes of consistency and clarity, we refer to him in this opinion as "Mickey."

weeks after the incident, following a twelve day drug binge, Barry was arrested for selling narcotics and was taken to the police station for questioning. He provided a tale regarding a schoolteacher and masked men, but because, at the time of that arrest, he claimed he was exhausted and intoxicated, he testified that he had no recollection of what he had stated to the police. In that statement, which was introduced at trial for substantive purposes as a prior inconsistent statement, Barry told the police that he was in the driveway of a house on Clinton Avenue when two men wearing masks approached. The two men had circled the block several times in a black vehicle moments earlier, leading Barry to believe that they were going to rob him. Barry felt threatened and yelled out for help for someone named "Fugi." The defendant appeared carrying a large weapon. The defendant told the two men to get on the ground and he pistol whipped them and removed a gun from both while they were on the ground. According to Barry, the defendant shot at one of the two men as he ran away, and yelled at the man who remained, whom Barry identified as a schoolteacher. The defendant then pistol whipped the schoolteacher again and fired five gunshots at him. During this incident, a white or cream colored vehicle pulled up, carrying four other men. One of the men, known to Barry as "Mickey," exited the vehicle, firing two additional shots at the man on the ground.

Measuring the state's suppression of the impeachment evidence against the testimony and statements of these "eyewitnesses," I do not agree that the evidence that the state failed to disclose was immaterial. These witnesses were neither compelling nor unimpeachable. Both Delgado and Barry were directly involved in the altercation, and both were there to engage in criminal activity. Only Younger was sufficiently removed, thereby allowing his testimony to be viewed through a

different lens. Therefore, I would conclude that the defendant has "show[ed] that the favorable evidence [regarding Younger] could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* v. *Whitley,* supra, 514 U.S. 435; *Hughes* v. *Johnson,* 191 F.3d 607, 629 (5th Cir. 1999), cert. denied, 528 U.S 1145, 120 S. Ct. 1003, 145 L. Ed. 2d 945 (2000).

"The prosecutor's obligation to disclose material information to the defense is a fundamental component of the guarantee that criminal defendants receive fair trials. Thus, we do not lightly excuse *Brady* violations." *United States* v. *Smith,* supra, 77 F.3d 517. I do not mean to suggest that the constitution is violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense. Nor do I propose that the constitution demands an open file policy. "While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see [*Brady* v. *Maryland,* supra, 373 U.S. 87]), the prosecution's responsibility for failing to disclose

known, favorable evidence rising to a material level of importance is inescapable." *Kyles* v. *Whitley*, supra, 514 U.S. 437–38.

Because the state's nondisclosures in this case significantly impaired defense counsel's ability to impeach the credibility of a principal prosecution witness, I would reverse the judgment of conviction and remand the case for a new trial.